**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SCOTT D. WOLF,<br><br>Plaintiff,<br><br>v.<br><br>WILLIS TOWERS WATSON NORTHEAST, INC.,<br><br>Defendant. | Case No. 1:26-cv-13183<br><br>JURY TRIAL DEMANDED |

## COMPLAINT AND JURY DEMAND

Plaintiff Scott D. Wolf alleges as follows against Defendant Willis Towers Watson Northeast, Inc. ("WTW Northeast"). In this Complaint, "WTW" refers collectively to WTW Northeast and its affiliates within the Willis Towers Watson group, including the London-based affiliates whose personnel performed the risk-engineering survey and provided marine insurance brokerage services for WTW's client, as described below.

## NATURE OF THE ACTION

1. Scott Wolf reported within WTW that WTW was withholding material information from its client about the cause of the client's April 2024 loss. The loss occurred at the client's cruise pier at the port of San Juan, Puerto Rico. The information WTW withheld from its own client was relevant to the client assessing and pursuing available insurance recovery, to potential recovery under the client's concession agreement, and to the client's disclosure obligations to public municipal bondholders.

2. WTW's client, San Juan Cruise Port LLC ("SJCP" or "the client"), was a borrower in a publicly offered municipal bond financing. The financing and the related public-private partnership transaction reached financial closing on February 14, 2024. At closing, SJCP assumed

operation of the publicly owned cruise terminals under a 30-year concession agreement with the Puerto Rico Ports Authority (PRPA).[1]

3. The approximately $187 million bond financing included approximately $110 million in publicly offered bonds and $77 million in privately placed bonds. The financing was intended to help fund repairs, improvements, and new construction at the cruise terminals in San Juan, Puerto Rico.

4. The information WTW withheld from its client concerned a marine fender,[2] a protective buffer used when ships berth. WTW's October 2023 risk-engineering survey report, prepared for the client, included a photograph of a misaligned fender at its client's cruise pier but did not identify the misalignment as a concern.

5. WTW's risk engineer later told Wolf that he had made a mistake by failing to identify the misaligned fender. He told Wolf that he believed, with a high degree of confidence, that the misalignment was likely the primary cause of the pre-existing damage that led to the client's April 2024 loss.

[1] For the project scope and public-private partnership background, see Puerto Rico Public-Private Partnerships Authority, *Modernization of the San Juan Bay Cruise Terminals (https://www.p3.pr.gov/existing-p3/modernization-of-the-san-juan-bay-cruise-terminals)* (accessed Oct. 26, 2026).

[2] A marine fender is a protective buffer that absorbs or dissipates a vessel's impact energy during berthing, helping protect both the vessel and the pier or other berthing structure. See U.S. Department of Defense, Unified Facilities Criteria 4-152-01, Design: Piers and Wharves § 5-1.1, at 103 (Jan. 24, 2017, Change 1 Aug. 28, 2024).

6. WTW signed an insurance broker certificate delivered to the bond trustee at the February 14, 2024 closing. Wolf later signed WTW's September 3, 2024 construction-insurance certificate, addressed to SJCP and the bond trustee in connection with the same public financing.

7. Wolf, a former corporate lawyer, knew the information WTW was withholding from its own client, a borrower financed through publicly offered municipal bonds, was relevant to the client's ability to make accurate disclosures to bondholders. He believed that withholding the information, which was directly relevant to the cause of the client's loss, could cause the borrower's disclosures to be inaccurate and expose WTW to significant liability for securities fraud. Wolf objected to the withholding and told WTW's lawyers that he believed it was illegal.

8. WTW discharged him on December 2, 2024, fifty-two days after his October 11, 2024 report and objection.

9. WTW attributed Wolf's discharge to "position elimination given the company is undergoing restructuring to adapt to current market conditions and ensure long-term sustainability."

10. Renewable commercial insurance revenue credited to Wolf was approximately $1.88 million at the end of 2021. WTW's initial 2025 incentive calculation, provided to Wolf on January 29, 2025, showed an adjusted ending book, net of one-time revenue, of $2,865,222 for 2023 and $3,109,686 for 2024. "Adjusted ending book" was WTW's measure of the book of business credited to Wolf.[3]

---

[3] For comparison, WTW reported organic revenue growth for its Risk & Broking segment of 3% for 2022, 10% for 2023, and 8% for 2024, about 22% over the three years, while the renewable revenue credited to Wolf rose from approximately $1.88 million at the end of 2021 to an adjusted ending book of $3,109,686 in 2024. WTW, WTW Reports Fourth Quarter and Full Year 2022 Earnings, Supplemental

11. The client engaged WTW to perform the risk-engineering survey before placement of the client's insurance. A risk engineer employed in WTW's London office performed the survey and prepared the report. WTW delivered the report to the client in October 2023 as one of the client's pre-closing due diligence reports. The report was relevant to identifying pre-existing damage and assessing the client's potential recovery under the concession agreement before closing.

12. The concession agreement — SJCP's contract to run the port — required the client to provide evidence of the required insurance coverages on or before the February 14, 2024 closing.

13. WTW acted as the client's broker in procuring that insurance.

14. On April 11, 2024, a docking structure called a berthing dolphin at Pier 3 West failed during the berthing of the MSC Meraviglia. Pier 3 West remained unavailable to the largest cruise

Segment Information (Feb. 9, 2023), https://investors.wtwco.com/node/25731/pdf; WTW, WTW Reports Fourth Quarter and Full Year 2023 Earnings, Supplemental Segment Information (Feb. 6, 2024), https://investors.wtwco.com/node/26936/pdf; WTW, WTW Reports Fourth Quarter and Full Year 2024 Earnings, Supplemental Segment Information (Feb. 4, 2025), https://www.sec.gov/Archives/edgar/data/1140536/000117184325000589/exh_991.htm (each accessed Oct. 26, 2026). In 2022, Wolf voluntarily transferred approximately $400,000 of the renewable revenue credited to him in 2021 to a more senior producer on account of that producer's historical and go-forward mentorship. From the approximately $1.48 million that remained credited to Wolf, that revenue grew about 110% over the same three years. WTW Northeast's own September 3, 2024 complaint against Wolf's former supervisor alleged that the Private Equity and Transaction Solutions practice in which Wolf worked "had been struggling since 2020." Complaint ¶ 15, Index No. 158103/2024 (N.Y. Sup. Ct. N.Y. Cnty.), NYSCEF Doc. No. 1.

ships it served for more than fourteen months, forcing affected sailings to bypass San Juan, Puerto Rico. Wolf understood that passenger and dockage fees from cruise ships using Pier 3 West supported repayment of the bonds and SJCP's revenue-sharing payments to PRPA under the concession agreement.

15. The client subsequently submitted an insurance claim.

16. On or about September 18, 2024, the insurers denied the client's claim for property damage and business interruption. SJCP later sued the insurers to challenge the denial and asserted alternative negligence claims against WTW concerning the insurance placement and policy exclusions.

17. SJCP's Third Amended Complaint identifies the policy's exclusion for losses caused or contributed to by pre-existing damage as one of the stated grounds for denial.

18. On September 23, 2024, a risk engineer employed in WTW's London office told Wolf that he believed, with a high degree of confidence, that the fender misalignment shown in WTW's October 2023 risk-engineering survey report was likely the primary cause of the pre-existing damage cited by the insurers to deny SJCP's claim for the April 2024 loss.

19. On the morning of October 11, 2024, WTW directed Wolf to stop communicating with SJCP and Hartford, the managing agent for the lead underwriter, about the matter.

20. Wolf objected to stopping communications with SJCP and ending efforts to help it pursue recovery.

21. Wolf objected that withholding the information was illegal.

22. Wolf stated that the borrower had disclosure obligations.

23. Wolf also told WTW's lawyers that he had personally signed a certificate in connection with the bond offering.

24. Wolf believed WTW should continue advocating for SJCP and pursuing available recovery.

25. During the afternoon of October 11, 2024, WTW's Head of Corporate Risk and Broking for North America (the North America broking head) authorized a limited approach to Hartford, which Wolf pursued while barred from sharing the risk engineer's explanation. By November 2024, Hartford had agreed to facilitate a proposed ex gratia (goodwill) payment to the client and had offered to provide its third-party inspection reports to SJCP to help SJCP pursue recovery from PRPA's historical property insurance,[4] and SJCP had indicated it was prepared to accept. That work remained unfinished when WTW discharged Wolf.

26. Wolf understood that SJCP had continuing disclosure obligations to municipal bondholders. He believed the client needed the information to assess losses that might not be covered by insurance, pursue recovery, and make accurate disclosures. WTW had also signed an insurance broker certificate delivered to the bond trustee at closing. Wolf therefore believed that withholding material information could expose WTW to substantial liability under federal securities law.

27. Wolf's internal reports concerning the risk engineer's explanation and the withholding of material information from SJCP, together with his objection to the complete stand-down directive, were a contributing factor in his discharge.

28. WTW's stated restructuring rationale was a mere pretext for selecting Wolf for discharge because of his internal reports and objection.

[4] Property insurance is typically written on an occurrence basis, covering physical loss or damage that occurs during the policy period. Hartford presented its third-party reports as showing pre-existing damage that appeared to date back several years. SJCP's policy took effect at the February 14, 2024 closing.

29. On December 2, 2024, after Wolf was told that his position had been eliminated, Wolf spoke with the North America broking head.

30. On that call, Wolf asked for the actual reason for his discharge because WTW's stated explanation did not make economic sense to him.

31. In response, the North America broking head asked Wolf, "What happened with Kelly Smits?" Smits was a WTW Assistant General Counsel who had directed Wolf to stop communicating with SJCP and Hartford about the matter.

32. Wolf brings this action under the Sarbanes-Oxley Act and Illinois law. WTW Northeast is a covered employer because, on information and belief, its financial information is included in the consolidated financial statements of its publicly traded parent. Wolf seeks reinstatement or other available make-whole relief, compensation for the harm caused by his discharge, and the other relief requested below.

33. Wolf reported conduct he reasonably believed violated SEC rules, including Rule 10b-5, to persons with supervisory or investigative authority at WTW. Wolf's reports concerned WTW's conduct toward its client, a municipal bond borrower. Wolf's protection under the Sarbanes-Oxley Act does not depend on employment by that client.

## PARTIES, JURISDICTION, AND VENUE

34. Plaintiff Scott D. Wolf is a citizen of Illinois domiciled in Cook County.

35. WTW Northeast employed him from 2017 through December 2, 2024. He worked in Illinois, including from his Illinois residence, and reported to New York-based supervisors.

36. In a March 10, 2025 letter, WTW's counsel stated that WTW's records showed Wolf was assigned a regular office location in Chicago, Illinois, and that Illinois law governed his Employment Agreement.

37. WTW Northeast is a New York corporation formerly named Willis of New York, Inc. Its principal place of business is New York, New York.

38. WTW Northeast admitted that location in its answer, ECF 25, to paragraph 7 of San Juan Cruise Port LLC's (SJCP's) Third Amended Complaint, ECF 14, in the related action in the United States District Court for the District of Puerto Rico, No. 3:25-cv-01063. Wolf's employer was WTW Northeast, and Wolf asserts his claims against WTW Northeast.

39. This Court has original jurisdiction over Count I under 28 U.S.C. § 1331 and over Counts II and III under 28 U.S.C. § 1332(a), because the parties are citizens of different states and the amount in controversy, including back pay, exceeds $75,000 exclusive of interest and costs. Alternatively, the Court has supplemental jurisdiction over Counts II and III under 28 U.S.C. § 1367(a) because they arise from the same reports, objections, and discharge.

40. WTW Northeast employed Wolf in this District and directed his Illinois-based work. A substantial part of the events giving rise to this action occurred here. The Court has personal jurisdiction over WTW Northeast, and venue is proper under 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

***Wolf's work and the publicly financed port***

41. Wolf worked for WTW in its Private Equity and Transaction Solutions practice, now called Alternative Asset Insurance Solutions.

42. He previously practiced corporate law for five years after law school at the University of Chicago, where his coursework included securities and financial-institutions regulation. During the relevant period he was an inactive Illinois-bar member and held an active Illinois insurance producer license.

43. During seven years at WTW, Wolf helped clients and referring lawyers address insurance needs for transactions and business risks. His work depended on trust, discretion, and helping clients obtain the information needed to assess their insurance exposure.

44. SJCP operates the cruise port in San Juan, Puerto Rico. It is a borrower with continuing obligations to provide information to investors in publicly offered municipal bonds.

45. The port was financed in part through approximately $187 million in municipal bonds, including approximately $110 million publicly offered in U.S. capital markets.

46. SJCP operates and is responsible for improving the publicly owned cruise terminals under a 30-year concession agreement with PRPA.

47. Pier 3 West, a berth at the port of San Juan, Puerto Rico, was the port's only berth able to accommodate the world's largest cruise ships, and Wolf understood its revenue to support repayment of those bonds.

48. WTW acted as SJCP's independent insurance broker and assisted SJCP in procuring a ports package policy.

49. Wolf led WTW's relationships with SJCP and its construction contractor, ENKA Construction and Development, LLC (ENKA). SJCP specifically asked ENKA to work with WTW on the construction insurance because SJCP remained responsible under the concession agreement for ensuring that the required coverage was in place.

50. Wolf began work on the SJCP account in 2019. He coordinated with SJCP's parent, Global Ports Holding, and the initial purchaser's infrastructure and project finance group on the proposed public-private partnership to modernize the port.

51. The project became the client's corporate group's first cruise-port concession in U.S. territory.

52. At the outset, Wolf was told that the initial purchaser wanted a large U.S.-listed broker for the international client group's U.S. public offering.

53. A WTW risk-engineering survey report, provided to the client in October 2023, included a photograph of a misaligned fender at Pier 3 West but did not identify the misalignment as a concern. The report preceded the insurance placement and bond closing. WTW's London-based risk engineer who performed the survey is referred to below as the risk engineer.

54. On November 17, 2023, Wolf discussed the pre-existing-damage exclusion for Pier 3 with the chief financial officer of SJCP's parent, Global Ports Holding, who was also SJCP's president, and WTW's London marine broker.

55. WTW's London marine broker proposed, in substance, an exclusion for losses arising from or related to any known or unknown pre-existing damage at Pier 3.

56. The client executive objected and pointed to (i) the Puerto Rico Public-Private Partnerships Authority's June 15, 2018 public study and (ii) WTW's clean October 2023 risk-engineering survey report, which recommended no repairs to Pier 3.

57. The client executive stated, in substance, that no other damage to Pier 3 was known apart from the Initial Investment Projects identified in the concession agreement, which were scheduled for completion before or around financial closing. The client stated that a broad pre-existing damage exclusion was not appropriate for Pier 3.[5]

[5] The client executive was the chief financial officer of Global Ports Holding, which describes itself as the world's largest independent cruise port operator.

58. The Puerto Rico Public-Private Partnerships Authority's June 15, 2018 public study described a condition assessment that included diving inspections. It described Pier 3 as being in excellent condition and, in its hurricane-damage assessment, satisfactory overall.[6]

59. WTW's October 2023 risk-engineering survey identified no needed repairs to Pier 3 and did not flag the photographed fender misalignment as a concern.

60. On November 17, 2023, after the client's protest, Wolf wrote to his co-producer on the account that the proposed terms left a significant coverage gap and flagged the pre-existing-damage exclusion. Wolf suggested that WTW's North American marine broker join all communications with the insurer.

61. Wolf also then personally negotiated the wording and scope of the pre-existing-damage exclusion with WTW's London marine broker, and obtained sign-off on the negotiated exclusion from the client executive who had protested on the November 17, 2023 call.

62. The exclusion Wolf understood to be final restricted coverage for losses arising from or related to a list of known pre-existing damage. That list comprised known pre-existing damage

[6] Puerto Rico Public-Private Partnerships Authority, Desirability & Convenience Study: Puerto Rico Cruise Terminals 9, 37-38 (June 15, 2018), https://docs.pr.gov/files/P3-PublicaPrivadas/Projects/Projects/SAN%20JUAN%20BAY%20CRUISE%20TERMINALS/dc-study-pr-cruise-terminals.pdf (accessed Oct. 26, 2026). The study contrasted Pier 3 with the other piers in the Initial Investment Projects: Pier 4 was in "serious condition," with a recommendation that it "be demolished and replaced," and the Pan-American Piers were "in poor condition" with "widespread advanced deterioration," while Pier 3, renovated in 2013, was "in excellent condition." Id. at 37–40. In its hurricane-damage assessment, the study added: "Two walkways and one fender need to be replaced." Id. at 38.

at specified property awaiting repairs or renovation under the concession agreement's Initial Investment Projects, and repairs identified in WTW's October 2023 risk-engineering survey. The negotiation preceded the lenders' insurance adviser's December 8, 2023 draft report.

63. Shortly thereafter, SJCP requested that Wolf review the lenders' insurance adviser's report to be used in connection with the public bond offering.

64. Wolf reviewed the December 8, 2023 draft lenders' insurance adviser's report in light of his understanding of the negotiated exclusion.

65. At SJCP's request, Wolf coordinated the policy forms with the lenders' insurance adviser and counsel for the bonds' initial purchasers.

66. On December 13, 2023, WTW's North American marine broker circulated within WTW, with Wolf copied, a certificate of insurance and the "Agreed Contract of Insurance (slip/policy)," advising that the signed slip would follow the next day and asking another WTW colleague to let him know "if anything outstanding on our side."

67. On December 15, 2023, Wolf sent the initial purchasers' counsel "the proposed operational policies" on a distribution that included SJCP, its counsel, and the lenders' insurance adviser.

68. He had asked all of the brokers overseeing each coverage line to make sure that the policy forms were substantively complete, as the client had requested, and he had noted that substantive completeness was important because of the public bond offering.

69. Wolf understood the policy forms to be substantively complete at that point, subject to final coverage periods, premiums and lender endorsements, and he reviewed the lenders' insurance adviser's report on that basis.

70. The Initial Investment Projects in Schedule 13 included the "Pier 3 Project," listing the Pier 3 EPIC repairs and replacement of a missing fender. Appendix H describes the EPIC repairs as reconstruction of two collapsed mooring dolphins on the east side of Pier 3 and associated work. Schedule 13 separately listed repairs and improvements to the Piers 1–4 walkway.[7] The lenders' technical adviser's monitoring report states that PRPA completed and commissioned the Pier 3 project before the February 14, 2024 closing, as described in paragraph 84.

71. As producer, Wolf coordinated the placements across the required coverage lines. WTW's marine specialists were responsible for finalizing the marine policy wording. WTW's North American marine team was responsible for coordinating with its London marine team on the marine policy.

72. After Wolf understood the policy forms to be substantively complete, additional lender endorsements were requested. On January 11, 2024, before the bond closing, WTW's London marine broker transmitted revised policy wording to WTW's North American marine broker. This was the same London broker whose proposed exclusion had prompted the client's objection on the November 17, 2023 call described in paragraphs 54 through 57.

73. The London broker had previously shown his substantive revisions in red and explained them in his email. He had also included Wolf on revised drafts, knowing that Wolf had helped

---

[7] See *San Juan Bay Cruise Terminals Public-Private Partnership Agreement (https://docs.pr.gov/files/P3-PublicaPrivadas/Projects/Projects/SAN%20JUAN%20BAY%20CRUISE%20TERMINALS/sjct-concession-agreement.pdf#page=32)* § 1.1, at 25, 33 (Aug. 15, 2022); Schedule 13 (https://docs.pr.gov/files/P3-PublicaPrivadas/Projects/Projects/SAN%20JUAN%20BAY%20CRUISE%20TERMINALS/Schedules/Schedule-13-Executed.pdf) § 7, at 8–9, and app. H, at 49 (PDF p. 111) (accessed Oct. 26, 2026).

negotiate the pre-existing-damage exclusion. This transmission marked no changes and included no explanation identifying the broadened exclusion, and Wolf was not copied.

74. Wolf did not then understand that the negotiated wording had changed. Wolf expected any substantive change beyond the requested lender endorsements to be identified to him.

75. SJCP's Third Amended Complaint alleges that the January 11, 2024 revision broadened the exclusion, previously limited to property and handling equipment, to all policy sections.[8] It alleges that the broadened exclusion applied to all covered properties.[9]

76. In its action, SJCP also alleges that WTW accepted the broadened exclusion without notice to SJCP, and it pleads negligence claims against WTW as its broker in the alternative if the policy does not provide coverage. WTW's answer in that action, ECF 25, admits only that WTW identified certain issues within the Policy but otherwise denies those allegations.[10]

77. As Wolf understood that broader wording, it could reach losses attributable to other pre-existing damage at Pier 3, whether known or unknown, beyond the damage associated with the specified Pier 3 repairs.

78. In mid-January 2024, while the parties were finalizing the lender endorsements, Wolf was copied on a larger group email noting a few final policy revision comments. It included no redline.

---

[8] See Third Amended Complaint ¶ 35, *San Juan Cruise Port LLC v. Hartford Underwriting Agency Ltd.*, No. 3:25-cv-01063 (D.P.R.), ECF 14; WTW Answer ¶ 35, ECF 25.

[9] See Third Amended Complaint ¶¶ 35–38, *San Juan Cruise Port LLC v. Hartford Underwriting Agency Ltd.*, No. 3:25-cv-01063 (D.P.R.), ECF 14; WTW Answer ¶¶ 35–38, ECF 25.

[10] See Third Amended Complaint ¶¶ 32–33, 36–38, *San Juan Cruise Port LLC v. Hartford Underwriting Agency Ltd.*, No. 3:25-cv-01063 (D.P.R.), ECF 14; WTW Answer ¶¶ 32–33, 35–38, ECF 25.

79. Wolf had instructed the brokers managing all coverage lines required by the concession agreement that the policies needed to be substantively final in mid-December 2023.

80. The lenders' insurance adviser had finished its report for the publicly offered bonds. At SJCP's request, Wolf had personally reviewed that report and confirmed that WTW had no further comments.

81. Wolf understood the remaining changes to be endorsements adding protections requested by the lenders. He reasonably did not expect any of the proposed revisions to broaden the pre-existing-damage exclusion or reduce SJCP's operational coverage for Pier 3 West.

82. SJCP's president asked whether any changes were substantive. Based on his understanding described in paragraphs 78 through 81, Wolf answered, in substance, that there should not be any.

83. WTW's North American marine team was copied on that email. No one on that team clarified or stated that the revised policy, circulated without a redline, had broadened the pre-existing-damage exclusion. SJCP describes that broadening in paragraph 35 of its Third Amended Complaint as applying to "all sections, including liability (Section A1), business interruption (Section A3), and terrorism liability (Section B)."[11]

84. At the February 14, 2024 closing, Wolf understood the specified Pier 3 repairs to be substantially complete. Wolf understood that the pre-existing damage exclusion the client executive had signed off on concerned those specified repairs. He did not understand it to extend to losses related to unknown pre-existing damage at Pier 3. The lenders' technical adviser's

[11] Third Amended Complaint ¶ 35, *San Juan Cruise Port LLC v. Hartford Underwriting Agency Ltd.*, No. 3:25-cv-01063 (D.P.R.), ECF 14.

monitoring report, posted with the borrower's bond disclosures, states that PRPA completed and commissioned the Pier 3 EPIC repair project before the February 14, 2024 closing.[12]

85. At the February 14, 2024 bond closing, a WTW colleague signed for WTW an insurance broker certificate addressed to the bond trustee, which, subject to stated qualifications, confirmed that the listed policies were in full force and effect.

86. The attached marine certificate, dated February 9, 2024, identified WTW's North American marine broker as its contact and bore his signature as authorized representative.

87. Unlike the policy wording described above, the attached marine certificate's coverage schedule listed a pre-existing-damage exclusion under liability but not under property and handling equipment, business interruption, or "Applicable to All Sections." The schedule listed Pier 3 as the only pier included in property coverage at inception; Pier 4 and the Pan American Docks were listed with attachment dates "to be advised."

88. The schedule and WTW's answer in SJCP's action identified different policy numbers. WTW admitted that the policy identified in its answer was issued on February 14, 2024. The schedule's omission of the exclusion from property and business interruption was consistent with Wolf's understanding described in paragraph 84.

89. On April 11, 2024, a docking structure called a berthing dolphin at Pier 3 West failed during the berthing of the cruise ship MSC Meraviglia.

90. SJCP submitted a claim under its policy.

---

[12] Infrata Limited, *San Juan Cruise Port Q1 2026 – V1 LTA Monitoring Report*, at 4, 10 (May 1, 2026), https://emma.msrb.org/P22042295-P21554514-P22013282.pdf ("Works have been completed and commissioned by PRPA prior to Financial Close") (accessed Oct. 26, 2026).

91. The berth remained closed to the world's largest cruise ships for more than fourteen months.

92. Between the April 11, 2024 loss and September 3, 2024, Wolf discovered that the operational policy's pre-existing damage wording had changed. He had asked why but received no explanation.

93. Before September 3, 2024, he still did not understand the significance of WTW London's survey photograph.

94. In the summer of 2024, WTW's North American marine broker told Wolf that he had been unaware of the broadened exclusion and disclaimed responsibility for the change. He also told Wolf, in substance, that it was abnormal for a pier with a recent clean survey to have that type of broad pre-existing-damage exclusion.

95. On September 3, 2024, after coordinating the separate construction placement at SJCP's request, Wolf signed WTW's construction-insurance certificate concerning ENKA's construction program. It was addressed to SJCP and the bond trustee and concerned the same public financing. It did not certify Pier 3 operational coverage.

96. The certificate, including its carve-out for fraud and willful misconduct, heightened Wolf's concern about the accuracy of insurance information connected with the public bond financing. He did not believe the operational-policy broadening affected construction insurance.

97. The Lloyd's of London underwriters subscribing to SJCP's policy (the Underwriters) denied SJCP's claim on or about September 18, 2024. SJCP alleges that the stated grounds included the Pre-Existing Damage Clause. WTW answered that the allegations do not pertain to WTW and that the policy speaks for itself. WTW also denied the allegations to the extent they

mischaracterized the policy.[13] Hartford Underwriting Agency Limited (Hartford) is the managing agent for the lead underwriter.

98. Before September 23, 2024, Wolf discussed the broadened exclusion with WTW's North American marine personnel.

99. At Wolf's request, WTW's North American marine broker located and forwarded to him the January 11, 2024 email chain, which Wolf had not previously received.

100. Having received no explanation for the change, Wolf, in his role coordinating SJCP's insurance placement for WTW, informed SJCP's president about the January 11, 2024 policy revision and told him that he was investigating what had happened.

101. Wolf informed the client so that the client could understand the change to its operational coverage, assess its uninsured exposure, and comply with its public disclosure requirements, and he did so before the risk engineer explained the significance of WTW London's photograph.[14] As a licensed Illinois insurance producer, he also understood that keeping a material

---

[13] See Third Amended Complaint ¶ 50, *San Juan Cruise Port LLC v. Hartford Underwriting Agency Ltd.*, No. 3:25-cv-01063 (D.P.R.), ECF 14 (quoting, as SJCP's allegation, an exclusion concerning "any pre-existing damage to buildings, property, jetties, wharves, or handling equipment scheduled under this insurance at the time of this policy inception"); WTW Answer ¶ 50, ECF 25.

[14] On May 29, 2024, the borrower, which, to Wolf's knowledge, had not been expressly told about the broadened exclusion, had disclosed in a supplement to the Official Statement that it did "not expect any material impact from the incident damaging the mooring dolphin at Pier 3W on the traffic at the Cruise Port Facility or on revenue of the Concession Company." Supplement to Official Statement dated May 29, 2024, at 2–4, particularly at 3. The quoted statement reflects the Concession Company's then-current expectations; the supplement separately qualifies its forward-looking statements. Wolf had not read that

change in coverage from his client would be a dishonest insurance-business practice under 215 ILCS 5/500-70(a)(8), the provision described in paragraph 236.

102. SJCP's concession agreement with the Puerto Rico Ports Authority provided that SJCP's obligation to restore damaged facilities "shall not be reduced in any manner by the unavailability of insurance proceeds."[15] That publicly available agreement also addressed casualty damage before closing and liabilities retained by PRPA. It contained PRPA's representation concerning compliance with law and provided for PRPA to indemnify SJCP for losses arising from breaches of PRPA's contractual obligations or representations and warranties, subject to the agreement's conditions and limitations.[16]

***The risk engineer's explanation and the September 23, 2024 report***

103. On September 23, 2024, the risk engineer explained the significance of WTW London's photograph to Wolf. The risk engineer said, in substance, that he had made a mistake by

---

disclosure when he informed the client. The disclosure had been made when the parties expected insurance coverage for the loss; SJCP's president needed to know that SJCP's loss might not be covered by insurance in order to assess SJCP's public disclosures. Wolf understood that the April incident had been publicly disclosed, but he had not read SJCP's actual disclosure when he made his reports.

[15] See *San Juan Bay Cruise Terminals Public-Private Partnership Agreement (https://docs.pr.gov/files/P3-PublicaPrivadas/Projects/Projects/SAN%20JUAN%20BAY%20CRUISE%20TERMINALS/sjct-concession-agreement.pdf)*, § 13.3(a), at 184 (Aug. 15, 2022) (PDF p. 191) (accessed Oct. 26, 2026).

[16] San Juan Bay Cruise Terminals Public-Private Partnership Agreement §§ 2.5(i), 3.2(c), 9.1(g), 9.5(a), 12.2(b), 12.3(a) (Aug. 15, 2022), https://docs.pr.gov/files/P3-PublicaPrivadas/Projects/Projects/SAN%20JUAN%20BAY%20CRUISE%20TERMINALS/sjct-concession-agreement.pdf (accessed Oct. 26, 2026).

failing to identify the misaligned fender, which could concentrate berthing loads and cause deterioration over time, and expressed a high degree of confidence that the misalignment was likely the primary cause of the pre-existing damage leading to the April 2024 loss.

104. When Wolf asked during that conversation whether the photographed fender was on the same berthing dolphin that failed in the April 2024 incident, the risk engineer confirmed that he believed it was. Wolf understood the risk engineer's account as an internal warning about the significance of information WTW possessed.

105. Wolf asked the risk engineer why he had not performed an underwater inspection. The risk engineer said, in substance, that he did not believe a dive was technically necessary because less than five years had elapsed since the prior inspection and he was following certain best practices. Wolf makes no independent engineering determination.

106. On or about September 23, 2024, Wolf reported the risk engineer's account and its recovery implications to WTW Assistant General Counsel Kelly Smits. That was the first time he reported the risk engineer's account to WTW's legal department.

107. Smits instructed Wolf that she needed to see all of WTW's written communications with SJCP or Hartford going forward.

108. Wolf responded that he believed WTW's most significant exposure was withholding information from a borrower on publicly offered municipal debt with public disclosure obligations. He clarified that he was an inactive lawyer and could not provide legal advice, but believed withholding this information from WTW's own client, in this fact pattern, and in light of the publicly offered debt and associated disclosure requirements, was unlawful.

***The October 2024 stand-down directive and Wolf's objection***

109. In early October 2024, Smits directed Wolf to stop external communications with SJCP and Hartford and prohibited further oral or written communications with the London marine broker about the matter.

110. Wolf understood that those instructions would keep SJCP from receiving a complete account of the coverage issue, the risk engineer's explanation, and potential recovery.

111. On October 10–11, 2024, Wolf took his concerns about the survey, the exclusion, and the restrictions on his communications to the North America broking head, to whom Wolf's direct supervisor after July 2024 (the new supervisor) reported directly. This was the first time Wolf gave the broking head the risk engineer's explanation of the fender condition.

112. Wolf explained that SJCP had public debt and disclosure obligations and that withholding material information could impair its assessment of financial exposure and disclosures to bondholders. He warned that withholding the information could also expose WTW to significant liability in connection with those obligations. In discussing his objection with the North America broking head, Wolf disclosed that his Illinois bar membership was inactive and stated that he was not providing legal advice.

113. On October 11, 2024, on a call with Wolf and a WTW lawyer based in the United Kingdom, Smits instructed Wolf on WTW's behalf to permanently stop communicating with Hartford and SJCP about the matter.

114. Wolf told Smits and the other lawyer that his Illinois bar membership was inactive.

115. Wolf explained that he had ethical obligations and could not engage in something illegal.

116. Wolf told them, in substance, that he did not think he could comply with WTW's directive to stand down completely.

117. Wolf objected that withholding the information was illegal.

118. Wolf stated that the borrower had disclosure obligations.

119. Wolf identified those obligations as a reason for disclosing the information to SJCP. He also told them that he had personally signed a certificate in connection with the bond offering.

120. Wolf said that he did not think he could follow the complete stand-down directive and would seek senior authorization rather than act unilaterally.

121. Wolf actually and reasonably believed that the reported conduct violated, or was likely to result in a violation of, federal securities antifraud requirements, including SEC Rule 10b-5. His belief rested on his five years practicing corporate law, his financing work, the construction-insurance certificate he signed (paragraphs 95 and 96), his review of the adviser's report, his study of federal securities regulation, and the facts then known.

122. He understood that a material uninsured loss to a revenue-producing asset supporting publicly offered municipal debt could require accurate disclosure to bondholders. That included disclosure through the continuing-disclosure undertaking that accompanies publicly offered municipal bonds under SEC Rule 15c2-12(b)(5). He also understood that federal antifraud rules apply to publicly offered municipal bonds even though those bonds are exempt from registration.

123. His concern was that the subsequent claim denial, continuing closure, the risk engineer's explanation, and potential recovery changed the financial information SJCP needed to assess its exposure and disclosure obligations. The risk engineer's explanation could also inform possible recovery under the concession agreement or under PRPA's historical property insurance, which could respond to damage that occurred before SJCP's own policy began, reducing uninsured loss.

124. Later on October 11, 2024, after the call with WTW's lawyers described in paragraph 113, the North America broking head authorized WTW's North America head of marine, WTW's North America carrier relations leader, and Wolf to approach Hartford's senior management. Wolf participated only in that authorized approach.

125. WTW continued to prohibit him from discussing its knowledge of the significance of the misaligned fender, including the risk engineer's explanation described in paragraphs 103 and 104. That restriction applied to his communications with both Hartford and SJCP.

126. To Wolf's knowledge, as of the date of this Complaint, WTW had not given SJCP the risk engineer's explanation and had not told the other parties to SJCP's action, including Hartford, about it.

127. On or about October 14, 2024, Wolf participated in the approved call with WTW's North America head of marine, WTW's North America carrier relations leader, and Hartford Global Specialty.

128. Hartford showed the WTW meeting participants third-party post-incident inspection materials, including underwater photographs. Hartford agreed to facilitate a proposed ex gratia (goodwill) payment to the client and offered third-party inspection materials, including underwater photographs and videos, to assist SJCP in pursuing recovery under PRPA's historical insurance.

129. On November 10, 2024, an executive vice president of Hartford Global Specialty wrote to Wolf: "I'm glad it looks like we're going to be able to help." WTW's North America carrier relations leader and Wolf's co-producer and senior mentor communicated the proposed business resolution to the SJCP client executive who had signed off on the negotiated exclusion. SJCP indicated that it was prepared to accept the proposal. Claim documents were circulated on

November 26, 2024, but the proposed payment and delivery of inspection materials remained unfinished when WTW discharged Wolf.

130. On November 27, 2024, the Coast Guard announced that Pier 3 West remained closed to cruise ships pending satisfactory assessment studies and an on-site inspection. The announcement stated that the requested mooring and berthing studies had not been received. The berth therefore remained closed to cruise ships when WTW discharged Wolf five days later.[17]

131. Also on November 27, 2024, WTW's North America carrier relations leader asked Wolf not to join an SJCP claims call, and Wolf complied.

***The discharge and the selection explanation***

132. On December 2, 2024, fifty-two days after his October 11 report and objection, the new supervisor and Human Resources notified Wolf that his position was eliminated and his employment terminated.

133. On the December 2, 2024 call described in paragraphs 29 through 31, Wolf reminded the broking head that, after the October 11, 2024 stand-down directive, the broking head had authorized Wolf to continue advocating for SJCP with Hartford, the managing agent for the lead underwriter. Through that authorized approach, Hartford had agreed to facilitate a proposed ex gratia (goodwill) payment and offered to provide the third-party inspection reports and underwater images used to support the claim denial.

---

[17] See U.S. Coast Guard, *Coast Guard announces San Juan Port's Pier-3 West remains closed to cruise ships until further notice (https://www.news.uscg.mil/Press-Releases/Article/3980338/coast-guard-announces-san-juan-ports-pier-3-west-remains-closed-to-cruise-ships/)* (Nov. 27, 2024) (accessed Oct. 26, 2026).

134. Wolf believed those materials could help SJCP pursue recovery under PRPA's historical property insurance, which could respond to damage that occurred before SJCP's own policy began, and exercise its rights under the concession agreement. He told the broking head that SJCP was pleased with the proposed resolution and had contacted him on November 27, 2024, about a new business opportunity.

135. The broking head asked Wolf to send him information about Wolf's open matters, opportunities, and referral sources so that the broking head could push back on the discharge decision.

136. Later on December 2, 2024, Wolf called Smits because the broking head had answered his question about the actual reason for his discharge by asking about her. Smits denied firing him.

137. She acknowledged that she had informed the new supervisor after the October 11, 2024 call, and she stated that Wolf had said he did not intend to comply with the directive to stand down.

138. In response to the broking head's request described in paragraph 135, Wolf's December 2, 2024 email to the North America broking head described his open matters, opportunities, and referral sources and asked for a way to see the pipeline through. Written the evening of his discharge, the email also recorded that Smits had confirmed she informed the new supervisor that Wolf disagreed with her advice to stand down completely.

139. In his December 2, 2024 email, Wolf described the authorized approach as follows: "I'm grateful that I approached you and that we were able to resolve the issue with Hartford. Following the resolution, the client referred a great new opportunity (attached)." As stated in paragraphs 129 and 141, Wolf does not allege that the proposed payment had been made or that delivery of the inspection materials had been completed.

140. In the same December 2, 2024 email, Wolf wrote that he had apologized to Smits. He wrote that, "[i]f she felt the need to contact my supervisor, I recognize that I could have handled the situation better, including contacting you sooner." He did not withdraw his underlying concern about withholding material information.

141. On December 3, 2024, Wolf asked a North American marine colleague to help finalize the proposal; the colleague responded, "Yes of course." Wolf does not allege that the proposed payment had been made or that delivery of the inspection materials had been completed.

142. On December 11, 2024, Wolf wrote in a text message to a WTW marine colleague that the only thing the North America broking head had cited was that he had told Smits he did not feel he could do what she was asking and planned to call her boss.

143. Wolf complained to Human Resources on December 11, 2024, that his discharge was retaliatory and spoke with Human Resources that day.

144. Human Resources responded on December 16 that his employment was terminated due to "position elimination given the company is undergoing restructuring to adapt to current market conditions and ensure long-term sustainability."

145. After the discharge, WTW did not place an away message on Wolf's former WTW email account. On December 14, 2024, he asked Human Resources to add a message stating that he was no longer with WTW. On December 16, he told Human Resources that several people had contacted him asking why he was not responding. That evening, he asked the new supervisor to add the message because clients were still calling. WTW implemented the message on December 17, 2024, more than two weeks after the discharge.

146. By December 12, 2024, in requesting review, Wolf had also provided Human Resources with names of people he believed had relevant information.

147. On December 31, 2024, Wolf wrote to Human Resources that, on the day of his discharge, the North America broking head had told him that Smits had called the new supervisor to report that Wolf had not followed Smits's direction.

148. On January 8, 2025, the North America broking head told Wolf that the new supervisor had made the selection and disclaimed responsibility. WTW confirmed that his separation from WTW took effect December 3, 2024, the day after he asked Wolf, "What happened with Kelly Smits?"

149. Wolf's accounts in paragraphs 142 and 147 linked his selection to his objection to the stand-down directive. The former North America broking head's statement in paragraph 148 attributed the selection to the new supervisor. WTW's written explanation attributed the discharge to restructuring.

150. Wolf had no further call with Human Resources before it issued its January 28, 2025 response. In that response, Human Resources wrote: "Our investigation has concluded and we're confident that your separation was due to a bona fide position elimination, and we will not be reinstating your employment with WTW."

151. The response did not identify the criteria used to select his position.

152. WTW's written explanation for the discharge was position elimination due to restructuring.

153. Based on the communications described above and the supervisory relationship, Wolf alleges on information and belief that Smits's report of his objection reached the new supervisor before the selection became final. He further alleges on information and belief that the new supervisor used his objection as a reason to bring about his inclusion in the restructuring selection.

154. Wolf did not observe the full decision process and does not know all participants or who had final approval authority.

155. Before filing this action, Wolf pursued internal and administrative review. He complained to Human Resources that his discharge was retaliatory, as described in paragraphs 143, 146, and 147, and he timely submitted a Sarbanes-Oxley Act (SOX) retaliation complaint to the Occupational Safety and Health Administration (OSHA) on May 30, 2025.

156. He disputes that a July 2025 administrative disposition validly closed or withdrew his OSHA complaint.

157. More than 180 days have elapsed since his original filing, and he has received no final decision of the Secretary of Labor. WTW has maintained the discharge.

158. As alleged in paragraph 10, WTW's initial 2025 incentive calculation showed the adjusted ending book credited to Wolf rising from $2,865,222 for 2023 to $3,109,686 for 2024.

159. His 2023 evaluation stated that he fully met expectations.

160. On the day of his discharge, Wolf listed more than sixty ongoing client relationships and open client, prospect, and referral-source opportunities in the December 2 email described in paragraphs 138 through 140.

161. As late as November 27, 2024, five days before his discharge, SJCP's corporate group asked for his advice on insurance requirements for a new pier project.

162. His WTW email access ended while clients continued contacting him.

163. Those facts support his allegation that substantial client work continued when his position was eliminated.

***The May 2024 warning***

164. Wolf received one formal written warning in his seven years at WTW, and WTW did not cite it to Wolf when it eliminated his position. On May 3, 2024, WTW issued that warning.

165. Wolf understood it to concern his tone on a March 29, 2024 Teams call about a client renewal.

166. Human Resources told Wolf that, apart from him, it interviewed only two people in the investigation preceding the warning: the two employees whose renewal work was at issue.

167. Wolf provided Human Resources evidence of those employees' broking errors on the renewal.

168. Wolf's then-supervisor told him that a senior WTW professional liability specialist had confirmed the renewal errors Wolf identified. The global client advocate, one of those two employees, was responsible for the entire account, including the coverage line with the errors. Apart from those two employees, Wolf is not aware of any employee who approached Human Resources about his conduct during his tenure at WTW.

169. Wolf's then-supervisor, who wrote the warning, later clarified to Wolf that the warning's reference to a pattern of reports concerned Wolf's communications in this specific renewal dispute, not matters outside it. Human Resources told Wolf that the warning was based solely on information from those two employees concerning that account.

170. The warning did not criticize Wolf's production figures, and he is not aware of a further documented incident before his discharge. Neither Human Resources communication described in paragraphs 144 and 150 identified the May 2024 warning as a reason for his selection.

***Mitigation and post-employment restrictions***

171. Wolf has sought to mitigate his losses.

172. The two-year client and prospect restrictions WTW asserts, which run through December 2, 2026, have limited his ability to serve clients and prospects.

173. The restrictions WTW asserts extend to relationships that predated Wolf's employment at WTW and that he disclosed in writing before he began working there.

174. The discharge caused lost earnings and benefits, impairment of earning capacity, emotional distress, and reputational harm.

175. The abrupt termination of his employment, despite the increase from 2023 to 2024 in the adjusted ending book reflected in WTW's incentive calculation, damaged his professional standing in a business dependent on the confidence of clients and referral sources.

176. Because the client and prospect restrictions described in paragraphs 172 and 173 run for two years from the date of his discharge, the discharge further limited his ability to restore his earning capacity.

***Positions in the related insurance litigation***

177. In pleadings filed after Wolf's discharge in the related Puerto Rico litigation, Hartford Underwriting Agency Limited invokes pre-existing damage in its coverage defenses. It identifies itself as a managing agent, not an insurer or a syndicate subscribing to the client's policy. Hartford states that its answer is filed solely on its own behalf.[18]

178. MSC Cruise Management (UK) Limited, the operator of MSC Meraviglia and a defendant in SJCP's pending federal action, alleged that the berthing involved "no hard contact or allision" and that any damage was "caused by pre-existing damage." It alleges that damage to the berthing dolphin during docking resulted from pre-existing damage and the client's failure to conduct periodic surveys of the pier facilities.[19]

---

[18] See Hartford Answer ¶ 1 and Affirmative Defenses ¶¶ 2, 5–9, *San Juan Cruise Port LLC v. Hartford Underwriting Agency Ltd.*, No. 3:25-cv-01063 (D.P.R.), ECF 49, at 1 & n.1, 7–9 (Nov. 14, 2025).

[19] See MSC Answer ¶¶ 5, 19 and Affirmative Defenses ¶¶ 16–18, *San Juan Cruise Port LLC v. Hartford Underwriting Agency Ltd.*, No. 3:25-cv-01063 (D.P.R.), ECF 38, at 2, 4, 18–19 (July 2, 2025).

179. The subscribing Lloyd's underwriters invoke pre-existing damage in their coverage defenses.[20]

180. In its answer in that action, WTW denied SJCP's negligence allegations. SJCP alleges that Pier 3's structural elements were "in adequate condition for operational use" before the incident. WTW denies that allegation for lack of knowledge or information sufficient to form a belief.[21]

181. Wolf's reports concerned the risk engineer's explanation of how the damage developed and why the client needed that information to assess its recovery options.

***Later credit assessment***

182. On February 25, 2026, more than a year after Wolf's discharge, S&P Global Ratings affirmed the bonds' BBB- rating but revised the outlook from stable to negative, citing construction uncertainties. In explaining that action, S&P reported that, according to project management, construction at Pier 4 had been delayed in part by traffic shifted from Pier 3 West following the April 2024 damage and closure. Wolf pleads that rating action as later public evidence that the April 2024 damage continued to carry consequences for the financing; it is not offered as evidence of what WTW knew in 2024.[22]

---

[20] See Subscribing Underwriters Answer ¶ 1 and Affirmative Defenses ¶¶ 3–7, *San Juan Cruise Port LLC v. Hartford Underwriting Agency Ltd.*, No. 3:25-cv-01063 (D.P.R.), ECF 48, at 1, 8–9 (Aug. 14, 2025).

[21] See Third Amended Complaint ¶ 23, ECF 14, at 6 (Apr. 8, 2025), and WTW Answer ¶¶ 23, 65–68, ECF 25, at 4, 11 (May 2, 2025), *San Juan Cruise Port LLC v. Hartford Underwriting Agency Ltd.*, No. 3:25-cv-01063 (D.P.R.).

[22] S&P Global Ratings, *San Juan Cruise Port LLC 'BBB-' Senior Debt Rating Affirmed; Outlook Negative Upon Construction Uncertainties*, at 1, 3 (Feb. 25, 2026).

## ADMINISTRATIVE PROCEEDINGS AND FEDERAL ELECTION

***The timely complaint and July 2025 disposition***

183. On May 30, 2025, 179 days after discharge, Wolf submitted SOX complaint No. 301054961 to OSHA, alleging retaliation for refusing communication restrictions he believed violated federal securities laws and connecting accurate risk information to SJCP's municipal bonds. He submitted a signed 15-page statement on July 1. No merits findings or preliminary order issued in that file.

184. On July 2, 2025, Wolf told OSHA that it would likely make sense to let his lawyers "lead communications," but offered to provide information or assistance directly when more efficient. On July 16, he asked the investigator to email his lawyers, copying him, to arrange a call. He participated in the July 21 call and continued supplying counsel information supporting his claim afterward.

185. After the July 21 call and before counsel's July 25 email, Wolf told counsel, in substance, that he was willing not to proceed at that time only if he could reopen the complaint later. He also said he did not want to jeopardize his right to federal court. He did not authorize a withdrawal permanently foreclosing the complaint or waiving his federal rights.

186. On July 25, 2025, counsel requested "the withdrawal letter, with no determination made by OSHA." Wolf was not copied and first saw that email when former counsel forwarded it on July 9, 2026, nearly a year later.

187. On July 28, 2025, OSHA told counsel it would process an administrative closure "rather than a Withdrawal, since official notification to the Complaint [sic] nor the Company has been made at this point." Wolf was not copied on that email either. OSHA's closure letter said counsel reported Wolf had decided not to proceed and attributed closure to his concurrence.

188. Less than an hour later, after closure, Wolf thanked the investigator, with whom he had worked since June, "for your kindness and support" and her "thoughtful interview, and follow up summary." His reply neither requested nor agreed to closure or withdrawal and was not written notice of a decision not to proceed. He did not understand it to relinquish administrative-review or federal-court rights.

189. Before closure, OSHA did not explain its potential consequences for those rights or that Wolf could decline administrative closure and have his complaint docketed and dismissed so he could object or request review. He did not know of that alternative. Neither the July 28 letter nor OSHA's reply to counsel explained those consequences or that alternative. Between July 21 and closure, OSHA did not ask him, directly or by copy, whether he had decided not to proceed or agreed to closure, notwithstanding his July 16, 2025 email telling the investigator, "If there is any additional information I can provide, or questions I can answer, please don't hesitate to reach out."

190. Wolf disputes that "with your concurrence" accurately described his conditional authorization or that counsel requested a withdrawal within it. He disputes that OSHA approved and notified the parties of a withdrawal under 29 C.F.R. § 1980.111(a), which requires written confirmation of the complainant's desire to withdraw, an approval determination, and notice to the parties and counsel. The July 28 letter was his only disposition letter at the time. Beyond that letter and the communications described above, he has received no record of withdrawal approval or notice to WTW.

***Requests to reopen and later proceedings***

191. On August 6, 2025, nine days after closure, Wolf asked counsel in writing to seek reopening "asap if you agree." He proceeded through counsel because he understood the engagement terms and counsel's instructions to require approval before contacting OSHA. "If you

agree" sought counsel's legal and procedural assessment. He was not expressing uncertainty about wanting the complaint reopened.

192. On August 26, 2025, Wolf directly requested reopening with the May 30 filing date, alleging discharge for refusing what he believed was an ongoing securities violation and providing documents. OSHA replied that the complaint "is closed," a new filing would be untimely and processed without investigation, it could not toll based on communication disputes with counsel, and further supporting documents would not be reviewed.

193. Wolf again asked counsel on September 7 and 15, 2025, to pursue reopening or authorize him to do so. He requested supervisory review and reopening on December 4, 2025, and renewed it on December 21, 2025. OSHA did not answer until April 13, 2026, when its Assistant Regional Administrator refused reopening and stated, "On July 28, 2025, we accepted your request to withdraw this complaint." That day, Wolf filed complaint No. 301076377, identifying his discharge and two later acts as independent bases.

194. OSHA's May 15, 2026 findings dismissed the later complaint as untimely and rejected equitable tolling. They acknowledged that Wolf "timely provided the same complaint he now brings to OSHA, in a timely manner, on May 30, 2025." They also stated that it "was not docketed and Respondent was not notified," and that "Complainant requested a withdrawal of the complaint and indicated that he did not wish to proceed." Wolf disputes that characterization and the April 13 letter's similar description for the reasons above.

195. Wolf timely objected and requested a hearing on May 18, 2026; the findings therefore did not take effect under 29 C.F.R. § 1980.105(c) or become final under § 1980.106(b). OALJ docketed No. 2026-SOX-00036. Its July 2 minute order held in abeyance his motion to amend the caption, recognize the prior OSHA complaint, and preserve issues. It said timeliness and

substantive issues were for the presiding judge and had not been assumed against him. It clarified that the June 11 initial-disclosure stay lasted until lifted by that judge, rather than pending a timeliness determination.

***Primary and alternative grounds for federal review***

196. Wolf disputes that the July 2025 disposition validly closed or withdrew his timely complaint. The July 28 letter decided no merits and was not an ALJ or Administrative Review Board order. Alternatively, even if effective for OSHA's processing purposes, it was not a final Secretary's decision and did not extinguish his May 30 filing under 18 U.S.C. § 1514A(b)(1)(B). More than 180 days have elapsed; based on the notices and orders received and on information and belief, no final Secretary's decision has issued and no delay is due to his bad faith.

197. If the disposition ended the original complaint, Wolf alternatively contends that his August 26, 2025 submissions qualified as a complaint under 29 C.F.R. § 1980.103. As a further alternative, he relies on the discharge allegations in his April 13, 2026 complaint. More than 180 days have elapsed from each filing and, on information and belief, neither has produced a final Secretary's decision and no delay is due to Wolf's bad faith.

198. For those alternatives, Wolf seeks equitable tolling under the circumstances above. His claim concerns action outside his conditional authorization, not ordinary attorney error. OSHA attributed closure to his concurrence without explaining its consequences or the docketed-dismissal alternative, discouraged further submissions as untimely, and left his December reopening requests unanswered until April 13. He pursued his rights diligently and disputes ratification: he received nothing from closure, continued supplying information, sought reopening within thirty days, persisted through counsel and supervisory requests, and filed anew the day OSHA answered.

199. On August 25, 2026, Wolf requested OSHA's underlying closure and withdrawal records and later pursued an administrative appeal. As of the date of this Complaint, he had not received the requested records.

200. This action challenges the December 2, 2024 discharge under SOX, the Illinois Whistleblower Act, and, alternatively, Illinois common-law retaliatory discharge. It does not plead the two later acts identified in the April 13, 2026 complaint, which Wolf does not abandon. Wolf relies on the alternative grounds above for de novo review under § 1514A(b)(1) and, if necessary, tolling the administrative filing deadline under § 1514A(b)(2)(D) and 29 C.F.R. § 1980.103(d).

201. The SOX claim rests on an actual and reasonable belief in an enumerated violation and does not require proof that a securities violation occurred.

***Separate Illinois Department of Labor proceedings***

202. Wolf separately pursues compensation before the Illinois Department of Labor under wage claim No. 25-0001275 and retaliation under new matter No. 26-P004360. This complaint does not plead a wage-payment claim or a retaliation claim under Section 14(c) of the Illinois Wage Payment and Collection Act, 820 ILCS 115/14(c).

## ARBITRATION

203. The SOX claim in Count I is excluded from predispute arbitration by 18 U.S.C. § 1514A(e)(2). Section 5(c) of Wolf's 2017 Employment Agreement with WTW excludes claims the parties cannot lawfully agree to arbitrate. Section 5(e) preserves the right to file administrative charges with the Department of Labor and state labor departments.

204. Section 5(a) excepts "a claim beginning with a request for injunctive relief brought by either party." Count II begins with that request, and Wolf invokes the exception. He requests judicial determination of the exception and the effect of Section 5(i)(ii)'s delegation language. He

contends that the Section 5(a) exception limits the delegation and leaves the Court to decide whether Count II falls within the exception.

205. Section 5(f) applies by its terms to a notice or request to arbitrate a Covered Claim, not a claim within the Section 5(a) exception. If any count is compelled to arbitration, whether Section 5(f) was satisfied is a question for the arbitrator.

206. In April and May 2021, WTW restated certain terms and conditions of Wolf's employment in two signed writings. The first was the April 1, 2021 Confidentiality and Non-Solicitation Agreement between Wolf and WTW itself. It stated that continuation of his employment was "conditioned upon execution of this Agreement." It restated the Employment Agreement's confidentiality, client and prospect non-solicitation, and termination-notice provisions. It contemplated that disputes "arising from or relating to this Agreement or the employment relationship" could be submitted to "a court of competent jurisdiction." It contained no arbitration clause.

207. The second writing was the Compensation Update Letter Agreement dated April 22, 2021, with WTW's affiliate Willis Americas Administration, Inc. Wolf signed and returned it on May 26, 2021, and WTW thereafter paid him under it. It updated his compensation, changed his career level, and defined "Good Cause" by reference to the Employment Agreement's restrictive covenant provisions.

208. In April 2025, Wolf sent WTW's counsel written communications that proposed arbitration of the enforceability of his restrictive covenants and asserted claims arising from his discharge under the Illinois Whistleblower Act, the common-law retaliatory-discharge doctrine, and Sarbanes-Oxley § 806.

209. Each communication was sent within six months of his discharge. If either state count is held arbitrable and the question is reached, Wolf relies on these communications as satisfying or excusing any written-request requirement. He does not concede that Count II or Count III is arbitrable.

210. If either state count is held arbitrable, he requests a stay under 9 U.S.C. § 3 rather than dismissal of that count, and continuation of any claims properly before the Court.

**COUNT I — SOX WHISTLEBLOWER RETALIATION (18 U.S.C. § 1514A)**

211. Wolf incorporates paragraphs 1 through 210.

212. WTW Northeast is a covered employer under § 1514A(a); on information and belief, its financial information is included in the consolidated financial statements of its parent, Willis Towers Watson Public Limited Company, a company whose securities are registered under Section 12 of the Securities Exchange Act of 1934. Exhibit 21.1 to the parent's 2024 Form 10-K identifies WTW Northeast as a subsidiary. Note 2 to that Form 10-K states that the consolidated financial statements include the accounts of the parent and its majority-owned and controlled subsidiaries.

213. On or about September 23, 2024, Wolf made the report to Smits described in paragraphs 106 through 108.

214. On October 10–11, 2024, Wolf made the report to the North America broking head described in paragraphs 111 and 112.

215. On October 11, 2024, Wolf made the report and objection to WTW's lawyers described in paragraphs 113 through 120.

216. Those reports and objections were protected under § 1514A(a)(1) because Wolf actually and reasonably believed, on the contemporaneous facts, that withholding the risk

engineer's explanation and related recovery information from SJCP was likely to cause or contribute to materially misleading disclosures to bondholders in violation of SEC rules, including Rule 10b-5.

217. Wolf reported and objected to WTW's own conduct. WTW brokered the borrower's insurance for the bond financing, performed the survey documented in the October 2023 report, and held the photograph and the risk engineer's explanation. It also signed the insurance broker certificate delivered to the bond trustee at closing and directed Wolf to keep the information from the client.

218. Wolf believed the withholding was deliberate because the stand-down directive followed his report of the risk engineer's explanation to Smits. He believed WTW's participation in withholding the information could itself violate those rules, apart from any resulting deficiency in SJCP's disclosures.

219. Smits had authority to investigate, discover, or terminate the reported misconduct, and the North America broking head had supervisory authority over Wolf.

220. WTW knew of the protected activity through Smits and the North America broking head. Smits acknowledged informing the new supervisor of Wolf's objection after the October 11 call, as alleged in paragraphs 137 and 138. As alleged on information and belief in paragraph 153, this information reached the new supervisor before the selection became final and influenced it.

221. Alternatively, if another WTW official made the final selection, Wolf alleges on information and belief that Smits's report and the new supervisor's resulting role in bringing about his inclusion contributed to the selection.

222. Wolf's reports and objections were a contributing factor in his discharge, even if restructuring or other considerations also played a role. He relies on the fifty-two days between his

October 11 objection and discharge (paragraph 132), the December 2 call with the North America broking head, and Smits's report of his objection to the new supervisor (paragraphs 29 through 31 and 133 through 140).

223. He also relies on the contrast between the broking head's reported explanation and WTW's written restructuring explanation (paragraphs 142, 144, and 147 through 152).

224. Further support is the client work and revenue continuing when his position was eliminated (paragraphs 158 through 163) and his exclusion from the SJCP claims call on November 27, 2024, five days before discharge (paragraph 131).

225. WTW Northeast discharged Wolf in violation of § 1514A. He seeks all available make-whole relief under § 1514A(c), including reinstatement with the same seniority status he would have had but for the retaliation, or front pay if reinstatement is impracticable, back pay with interest, special damages for the emotional distress, reputational harm, and impairment of earning capacity alleged in paragraphs 174 through 176, and recoverable costs and fees.

**COUNT II — ILLINOIS WHISTLEBLOWER ACT RETALIATION (740 ILCS 174)**

226. Wolf first requests injunctive relief: reinstatement with the same seniority status he would have had but for the violation, and correction of employment records found to result from retaliation, as relief necessary to make him whole. Section 30 authorizes reinstatement under either version of the Act. As amended, Section 30(1) also expressly authorizes permanent or preliminary injunctive relief. Wolf invokes the injunctive-relief exception in Section 5(a) of the 2017 Employment Agreement.

227. Wolf incorporates paragraphs 1 through 210.

228. WTW Northeast employed him in Illinois and is an employer under Section 5 of the Act, 740 ILCS 174/5. This count challenges the December 2, 2024 discharge in retaliation for his

internal disclosures to Smits and the North America broking head, made in the good-faith belief that the reported conduct violated federal securities law and, independently, Illinois insurance-producer law, and for the conduct alleged to constitute a refusal in paragraphs 231 through 234.

229. Section 90 of Public Act 103-0867 applies the Act's changes to "claims arising or complaints filed on or after January 1, 2025." Wolf invokes the complaints-filed branch because this action is filed after January 1, 2025. Alternatively, he pleads the pre-amendment claim in paragraphs 235 and 236.

230. If the amendments apply, he invokes Section 15(c). Smits had authority to direct and control his work performance and take corrective action regarding the reported conduct. The North America broking head had managerial authority to take corrective action and exercised it by authorizing the Hartford approach. Each qualified as a supervisor under Section 5.

231. If Public Act 103-0867 applies, Wolf also invokes Section 20 as amended. On October 11, 2024, he made the statements to WTW's lawyers described in paragraphs 114 through 120. He alleges that those statements communicated his refusal to participate in the complete stand-down directive, which required him to cease all communication with SJCP and Hartford about the matter.

232. Smits understood it that way, as reflected in her statements and Wolf's email described in paragraphs 136 through 138. Wolf declined the complete stand-down directive on October 11, 2024, before the North America broking head authorized the limited approach described in paragraphs 124 through 129.

233. With the North America broking head's approval, Wolf participated in the limited Hartford approach described in paragraphs 124 through 129. WTW's North America carrier relations leader and Wolf's co-producer conveyed the proposed resolution to SJCP. SJCP indicated that it was prepared to accept the proposal and continued to seek Wolf's insurance advice.

234. Wolf believed in good faith that complying with the complete stand-down directive described in paragraph 231 would violate 215 ILCS 5/500-70(a)(8). He sought senior authorization and later participated only in the limited approach authorized by the North America broking head, complying with the restriction described in paragraph 125.

235. In the alternative, if the amendments do not apply, Wolf invokes Section 20 as in effect on December 2, 2024, which prohibited retaliation for refusing to participate in an activity that would result in violation of a State or federal law, rule, or regulation. He relies on the conduct described in paragraphs 113 through 120 and 231 through 234 as an actual refusal.

236. Wolf alleges that complying with the complete stand-down directive would have required him, a licensed producer, deliberately to withhold material insurance and recovery information from his client. That would have constituted dishonest insurance-business practices within 215 ILCS 5/500-70(a)(8), which reaches an Illinois licensee's conduct of business "in this State or elsewhere." He alleges that the refused activity would have resulted in a violation of Section 500-70(a)(8). Independently, it would have resulted in a violation of SEC Rule 10b-5 and Sections 12(F) and 12(I) of the Illinois Securities Law of 1953, 815 ILCS 5/12(F), (I), for the reasons alleged in paragraphs 121, 122, and 216 through 218, which are incorporated here. This alternative rests on that alleged unlawfulness, not his belief alone.

237. WTW Northeast discharged Wolf in retaliation for those disclosures and that refusal. He alleges that WTW would not have selected him for discharge at that time absent the protected conduct and that the retaliatory action was based at least in part on his exercise of rights protected by the Act. He seeks the injunctive and monetary relief authorized by Section 30, including reinstatement with the same seniority status he would have had but for the violation and, as relief necessary to make him whole, correction of employment records.

## COUNT III — ILLINOIS COMMON-LAW RETALIATORY DISCHARGE, PLEADED IN THE ALTERNATIVE

238. Wolf incorporates paragraphs 1 through 210 and the factual allegations in paragraphs 231 through 234 and 236 concerning his refusal, the unlawfulness of the refused activity, and his subsequent authorized conduct. WTW Northeast employed him at will. His April 1, 2021 Confidentiality and Non-Solicitation Agreement with WTW states that he was "employed by Employer on an at-will basis," subject to fifteen days' notice or pay in lieu of notice.

239. Under Federal Rule of Civil Procedure 8(d)(2) and (3), he pleads this count in the alternative to Counts I and II, to the extent those statutes do not cover, or do not make a remedy available for, the alleged conduct.

240. Illinois has clearly mandated public policies against fraud and materially misleading statements or omissions in connection with securities transactions and in favor of full, truthful, and accurate disclosure to the public and to investors in publicly offered securities. Those policies are reflected in Securities Exchange Act Section 10(b), SEC Rule 10b-5, and Sections 12(F) and 12(I) of the Illinois Securities Law of 1953, 815 ILCS 5/12(F), (I).

241. Wolf's reports and objections in paragraphs 106 through 123 implicated those policies. He reported that withholding the risk engineer's explanation and related recovery information could impair SJCP's assessment of uninsured exposure from a loss affecting a revenue-producing asset supporting publicly offered municipal debt. It could also contribute to inaccurate or misleading disclosures to bondholders. He objected to keeping that information from WTW's insurance client.

242. Independently, on October 11, 2024, he declined the complete stand-down directive concerning SJCP and Hartford, as alleged in paragraphs 113 through 120 and 231 through 234. He

believed in good faith that following it would violate the laws reflecting those policies. That refusal is a separate and independent basis for this count.

243. WTW Northeast discharged Wolf because of those reports and objections and, independently, because of that refusal. As alleged on information and belief in paragraph 153, the new supervisor used his objection as a reason to bring about his inclusion in the restructuring selection. Wolf alleges that WTW would not have selected him for discharge at that time absent that conduct and that the discharge contravened the public policies identified above.

244. The discharge proximately caused the injuries described in paragraphs 174 through 176. Wolf seeks compensatory damages and, only to the extent legally available and supported by proof of willful or malicious disregard of the identified public policies, punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Wolf respectfully requests judgment against WTW Northeast and the following relief to the extent authorized by the count on which liability is established:

(A) Correction, expungement, or annotation of employment entries found to result from unlawful retaliation; reinstatement with the same seniority status Wolf would have had but for the retaliation and with the renewable book the evidence shows would have been credited to him absent the retaliation, taking its historical growth rate into account, or front pay on that basis if reinstatement is impracticable; and other equitable relief for proven continuing employment consequences;

(B) Back pay and lost benefits calculated on the same basis, and compensation for increased tax liability resulting from a lump-sum back-pay award;

(C) Compensation for proven emotional distress, reputational harm, and impairment of earning capacity, without double recovery;

(D) Under Count II, liquidated damages up to $10,000 and the $10,000 statutory civil penalty only to the extent the amendments and their remedies apply;

(E) Under Count III, punitive damages only to the extent legally available and supported by proof, without duplicative recovery;

(F) Recoverable litigation costs, expert fees, and reasonable attorneys' fees to the extent authorized; and

(G) Prejudgment and postjudgment interest where available and such further relief as the Court deems just and proper.

## JURY DEMAND

Wolf demands a jury on every issue triable by jury, including Count I under 18 U.S.C. § 1514A(b)(2)(E) and (e)(1), which bars any contractual waiver of rights or remedies under that section, and on all other counts to the extent a jury-trial right is available under the Seventh Amendment or the governing statute.

Dated: Northbrook, Illinois, October 27, 2026

Respectfully submitted,

/s/ Scott D. Wolf
Scott D. Wolf
2461 Shannon Road
Northbrook, IL 60062
+1 (312) 426-1511
sdwsh1012@gmail.com
Plaintiff
Attorney admitted to the Northern District of Illinois
ARDC No. 6310517